UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ERIC JOSEPH, | ) | CASE NO. 3:16CV2259 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY C. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF | ) | REPORT AND RECOMMENDATION |
| SOCIAL SECURITY, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Eric Joseph ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his application for disability insurance benefits ("DIB"). ECF Dkt. #1. In his brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ") erred by: (1) failing to consider, beyond boilerplate language, the 90% disability rating found by the United States Department of Veteran's Administration ("VA"); (2) failing to give credit to testimony concerning the impact of Plaintiff's impairments in combination and overemphasizing the need for just the right diagnosis, which she failed to offer; and (3) failing to attribute credibility to Plaintiff based upon his work record in the military. ECF Dkt. #16. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

**I.    PROCEDURAL AND FACTUAL HISTORY**

On June 24, 2013, an ALJ issued a decision finding that Plaintiff was not disabled for purposes of Supplemental Security Income and DIB for his applications filed on October 12, 2012. ECF Dkt. #9 ("Tr.") at 88, 104.[2] On May 8, 2015, Plaintiff applied for Disability Insurance Benefits,

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found by way of the search box at the top of the page on the ECF toolbar.  The page numbers correspond to the page numbers assigned in the transcript.

alleging disability beginning June 25, 2013 due to traumatic brain injury ("TBI")- memory, bad knees and ankles, degenerative disc disease ("DDD") of the back, neck pain, tinnitus, nerve damage and numbness in his hands and legs, anxiety, depression, panic attacks, mood disorder, and breathing difficulties.  *Id*. at 242.  The SSA denied Plaintiff's application initially and upon reconsideration. *Id*. at 145, 154, 155.

Plaintiff requested an administrative hearing, and on February 11, 2016, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE").  Tr. at 32, 162.

On April 27, 2016, the ALJ issued a Decision finding that from May 7, 2015, the protective filing date, through December 31, 2015, Plaintiff was not entitled to DIB because he was not under a disability.  *Id*. at 27.

Plaintiff filed a request for review, which was denied by the Appeals Council on July 12, 2016.  Tr. at 1-9.  On September 9, 2016, Plaintiff filed the instant suit seeking review of the Decision.  ECF Dkt. #1.  On February 13, 2017, Plaintiff filed the instant brief on the merits and on April 14, 2017, Defendant filed her brief on the merits.  ECF Dkt. #s 16, 18.  On April 29, 2017, Plaintiff filed a reply brief.  ECF Dkt. #19.

**II.**   **RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE**

The undersigned notes that the file contains over 2,000 page of medical records, many of which are duplicates.  Tr. at 282-2314.  Plaintiff spends two pages in his brief reviewing the medical evidence and Defendant's review of the medical evidence consists of less than two pages as well. ECF Dkt. #16 at 3-4; ECF Dkt. #18 at 5-6.  The undersigned will provide review of the relevant medical evidence.

**A.**   **MEDICAL EVIDENCE**

According to Plaintiff's brief, he served in the United States Army from 2001 to 2005 and served in the Persian Gulf War, in the war zone, from 2003-2004.  ECF Dkt. #16 at 6.  While part of a convoy traveling in a combat zone in Iraq, Plaintiff was a passenger in a lead vehicle that was attacked by improvised explosive devices and an ambush from the enemy and the vehicle in which he was riding crashed into the back of a bus, bouncing Plaintiff's body severely.  *Id.*  He was unable

to receive ordinary medical treatment immediately as it was too dangerous, so he was treated at the "camp 'War College'" by a combat medic until he was able to return to the United States in order to receive full medical treatment. *Id*. at 7.

June 10, 2013 x-rays of Plaintiff's left knee showed no signs of fracture or significant degenerative changes. Tr. at 291-292.

The medical records show that Plaintiff received medical treatment through the VA for diagnoses of depressive disorder, ankle instability, morbid obesity, tobacco dependence, hyperlipidemia, post-traumatic stress disorder ("PTSD"), gastroesophageal reflux disorder ("GERD"), neck pain, migraines, alcohol abuse and cannabis abuse. Tr. at 2017. Psychiatric progress notes from August 7, 2013 show that Plaintiff was on medications and he reported that he was doing well on them and he had started vocational rehabilitation. *Id*. at 1084. Psychiatric examination revealed that he was alert and cooperative, with relevant speech, average concentration, a mildly anxious labile affect, intact thought process, decreased memory, no suidical ideations or hallucinations, and fair to limited judgment and insight. *Id*. at 1084-1085. He was diagnosed with mood disorder, not otherwise specified, PTSD, alcohol abuse and cannabis abuse. *Id*. at 1085. A rule out of personality disorder was requested. *Id*. His GAF was rated at 64, indicative of mild symptoms. *Id*.

An August 18, 2013 CT of the abdomen and pelvis showed probable mild ileus with constipation, and a possible developing early partial bowel obstruction or reflux. Tr. at 290. It also showed a small hiatal hernia and a nonspecific left lower lung nodule. *Id*.

VA records indicate that in October of 2013, Plaintiff received service-connected disability benefits from the VA, with service-connected disability ratings of 10% for limited motion of the ankle, 20% (two 10% ratings) for inflammation of the sciatic nerve, 20% for degenerative arthritis of the spine, 10% for limited flexion of the knee, 10% for lumbosacral or cervical strain, 10% for tinnitus, 30% for migraine headaches, 20% for inflammation of the lower radicular nerves, and 30% for PTSD. *Id*. at 1197, 1826. There is also a 0% rating for traumatic brain disease as of May 7, 2013. *Id.* at 324, 326.

-3-

Plaintiff treated with a readjustment counselor from 2013 through 2014 for his PTSD, anxiety, personality issues, relationship issues, and alcoholism.  Tr. at 2114-2312.

October 4, 2013 ankle x-rays showed mild degenerative changes and no fracture or bone destruction.  Tr. at 286.  Cervical spine x-rays showed no malalignment or fracture and mild degenerative disc space changes at C6-C7.  *Id.* at 288.

Medical records show that Plaintiff was hospitalized from October 10, 2013 through October 18, 2013 at the Battle Creek VA Medical Center for the Mental Health Residential Rehabilitation Treatment Program with diagnoses of PTSD, depressive disorder, tobacco dependence, alcohol abuse of episodic drinking behavior, and cannabis abuse of an episodic use.  Tr. at 2085. Plaintiff reported that he had relapsed with alcohol six times in the last year and when in relapse, he did not take his medications.  *Id.* at 2086.  Physical examination showed limited cervical motion with left and right rotation and flexion, weak bilateral hand grasp and normal motor strength in both upper extremities.  *Id.*  Psychological testing indicated that the latter half of the assessment could not be interpreted because Plaintiff significantly changed his response attitude.  *Id.* at 1726.  Findings indicated that Plaintiff had good eye contact, was oriented, answered questions appropriately and with good logical thought, he had a mildly flat affect, no irritability or agitation, no delusions or hallucinations, and no suicidal or homicidal ideations. *Id.* The valid parts of the testing indicated that Plaintiff was not a suicidal or homicidal risk, he was under significant stress and most individuals with his testing response pattern have feelings of anxiety, depression, guilty and hopelessness and relationship difficulties due to insecurity, lack of self-confidence, lack of social skills and distrust of others.  *Id.* Others testing similar to Plaintiff also have unusual thought content and difficulty trusting others.  *Id.* at 1727.  The psychologist interpreting the remaining test results warned of caution in  interpretation which showed that Plaintiff had PTSD, severe depressive symptoms, an elevated anxiety level, severe insomnia, inflexible thoughts, difficulty communicating with others, and interpersonal difficulties, *Id.* at 1727-1729.  Plaintiff successfully completed the program at Battle Creek and his symptoms appeared to be lessening.  Tr. at 1726, 2085.  His global assessment of functioning score was 46, indicative of serious symptoms.  *Id.* at 2085.

-4-

On March 6, 2014, a VA doctor evaluated Plaintiff and diagnosed mild PTSD, unspecified personality disorder, unspecified related mood and bipolar disorder, and mild cannabis use order and alcohol use disorder in early remission. Tr. at 856. He found that no diagnosis of TBI was warranted. *Id*. at 858. Reports of Plaintiff's activities included taking his children to the zoo, going out for a meal with his wife, seeing his mother once per week, spending time with a friend twice a month and talking to him every week, going to church regularly, and collecting comic books. *Id.* at 860-861. The VA doctor found that Plaintiff was alert, with relevant speech, average attention and concentration, a mildly labile affect, with mild depression and anxiety, and fair to limited judgment and insight. *Id.* at 863. He found that Plaintiff's PTSD symptoms had not increased since his last examination in May of 2012. *Id*. at 867. He further found that Plaintiff had no residuals of TBI and none of Plaintiff's emotional and behavioral symptoms were seen as related to a TBI. *Id.* at 868.

Plaintiff had an alcohol relapse in March of 2014 and sought help. Tr. at 875-876.

Plaintiff underwent a head CT scan on May 4, 2014 for his complaints of headaches and vomiting. Tr. at 283. It was compared to a MRI of the brain from February 26, 2010. *Id.* The CT scan showed mild, age-appropriate cerebral involutional changes with no hemorrhage or acute intracranial abnormalities. *Id.* at 284.

A May 4, 2014 CT scan of the abdomen and pelvis showed no abnormalities. Tr. at 285.

In September of 2014, it was reported that Plaintiff had not had any contact with his therapist for at least two weeks. Tr. at 597. Plaintiff indicated that he did not have the money to travel for his appointments as he cleared out his bank account and spent his service-connection monies. *Id*. He was thereafter discharged from therapy. *Id*.

October 9, 2014 chest x-rays showed clear lungs and mild degenerative changes of the thoracic spine. Tr. at 282.

Plaintiff entered an inpatient psychiatric ward from October 10, 2014 until October 14, 2014 after he reported thoughts of harming himself as he stated that he felt like swerving his car into another car. Tr. at 317, 1360. Plaintiff reported that his medication was switched a few months prior and he did not feel that the new medication was working, so he was holding on to it, which

resulted in him not sleeping enough and having night terrors and sweats, and suicidal ideations. *Id.* at 317. Plaintiff was put back on the original medication and other medications were resumed as well. *Id.* at 318. It was noted that Plaintiff had been on and off of his medications for about eight years. *Id.* Upon his discharge, Plaintiff was stable and it was noted that Plaintiff was finally understanding that he would need medications for the rest of his life. *Id.* He was diagnosed with depressive disorder not otherwise specified, mood disorder not otherwise specified, and history of alcohol and cannabis abuse. *Id.* at 317. His GAF was 30 on admission, indicative of severe symptoms, and 50 on discharge, indicative of moderate symptoms. *Id.*

October 11, 2014 progress notes indicate that Plaintiff met with a psychiatrist at Fort Wayne VA Medical Center and he indicated that he was trying to catch up with his sleep and figure out his problems. Tr. at 1374. He stated that he was happy to be back on his medications. *Id.* The psychiatrist found Plaintiff to be relaxed, polite, and appropriate, with no speech, behavior or thought abnormalities. *Id.* He diagnosed mood disorder, not otherwise specified. *Id.*

June 4, 2015 progress notes from Fort Wayne VA Medical Center indicate that Plaintiff presented to Dr. O'Rourke, Ph.D., as a walk-in to update him on his progress. Tr. at 1380. Plaintiff stated that he was off of all of his psychiatric medications and had been for some time, and although it was a struggle at first, he ultimately felt better. *Id.* He also represented that he had been sober for the last 1.5 years and had his sixth child some time ago. *Id.* He indicated that he and his wife were doing better as a couple and he felt that he was addressing his stressors and problems more actively than in the past. *Id.*

Plaintiff also had an appointment with his primary care provider in the Fort Wayne VA Medical Center and he requested that he be scheduled for a neurology consultation due to his frequent headaches. Tr. at 323. Plaintiff was sent a letter thereafter from Mr. Miller, a licensed social worker and traumatic brain injury/polytrauma coordinator at Fort Wayne VA Medical Center, who informed Plaintiff that Plaintiff had a recent screening for TBI and a previous positive diagnosis/service connection for TBI. *Id.* at 326. Mr. Miller asked that Plaintiff contact him for follow up care and services and/or a TBI diagnostic examination. *Id.*

On June 12, 2015, an agency reviewing psychologist recommended that the ALJ adopt the prior ALJ's mental RFC for Plaintiff. Tr. at 122.

On June 27, 2015, Dr. Adamolekun examined Plaintiff at the request of the agency. Tr. at 1331. Plaintiff reported that his neck and back pain and his TBI kept him from working. *Id.* He described a 10-year history of neck and back pain due to his injuries while in the Army. *Id.* He received treatment with cortisone injections and reported that sitting and standing exacerbated his pain. *Id.* He rated the pain at 7 out of 10 on most days and 6 out of 10 on the examination date. *Id.* He indicated that the pain impacts his abilities to work as he had difficulty sitting, standing, walking, lifting and bending. *Id.* As to his TBI, Plaintiff reported that he suffered this injury in military combat and he had memory issues, a form of dyslexia, headaches, fatigue, tension and intermittent paralysis as a result. *Id.* at 1331. He indicated that this impacted his ability to work because he has difficulty concentrating. *Id.* Plaintiff estimated that he could sit and stand for thirty minutes each. *Id.* at 1332. He reported that he was seeing a neuropsychiatrist. *Id.* at 1335.

Upon physical examination, Dr. Adamolekun noted that Plaintiff had a steady gait, good hand-eye coordination, he was alert, made good eye contact, and had an appropriate mood and clear thought processes. Tr. at 1333. Sensory examination was normal, straight leg test was negative, and Plaintiff had no joint swelling, effusion, tenderness or deformity. *Id.* at 1334. Dr. Adamolekun reported that Plaintiff was able to lift, carry and handle light objects, he was able to squat and rise with some difficulty, he could rise from a seated position without assistance, but had some difficulty getting up and down from the exam table, and he was able to walk on his heels and toes with difficulty. *Id.* Dr. Adamolekun also noted that Plaintiff could dress and undress himself adequately, but he did not give good effort during the examination. *Id.*

Based upon his examination, Dr. Adamolekun indicated that he found no neurological abnormality or deficit and the musculoskeletal exam revealed no significant abnormality. Tr. at 1334-1135. He noted that Plaintiff did not give good effort during most of the evaluation. *Id.* His probable diagnosis for Plaintiff was PTSD, but he was unable to confirm this or find a reason why this was so. *Id.* at 1335. He also found that from a musculoskeletal standpoint, Plaintiff was unable to perform some of the activities because of his chronic back pain and his feeling that he was

-7-

unsteady.  *Id.* Dr. Adamolekun stated that from that standpoint, Plaintiff could be diagnosed with chronic back pain, but there had been no follow up from a physician that would determine that Plaintiff has had chronic back pain and what the triggering incident was.  *Id.*  The doctor also indicated that his prognosis for Plaintiff was good and until objective evaluations, such as x-rays were performed to show that Plaintiff had chronic back pain, he opined that Plaintiff could participate in daily living activities and would not qualify for disability at this point.  *Id*.  As to Plaintiff's psychiatric issues, Dr. Adamolekun indicated that Plaintiff may qualify for disability if records existed of the psychiatric issues that Plaintiff was claiming that he had.  *Id*.

Dr. Adamolekun opined that Plaintiff could sit, stand and walk normally in an 8-hour workday with normal breaks, he had no significant limitations in lifting and/or carrying objects, no limitations in bending, stooping, crouching, squatting and other postural activities, and he could perform these activities frequently.  Tr. at 1335.  The doctor also opined that Plaintiff had no manipulative limitations and no visual or workplace environmental restrictions.  *Id*.  He further opined that Plaintiff may have some relevant communicative limitations due to his history of PTSD and further psychiatric testing would be beneficial.  *Id*.

In July of 2015, Plaintiff presented to the emergency room for abdominal pain, dizziness, and back pain.  Tr. at 2071.  CT scans showed no acute findings.  *Id.* at 1458.

On July 10, 2015, Dr. Freihofner reviewed the records and opined that the prior ALJ's RFC should be adopted.  Tr. at 123.  This was affirmed by another doctor on October 7, 2015 upon reconsideration.  *Id*. at 136.

August 2015 progress notes from Fort Wayne VA Medical Center indicate that Plaintiff called the VA homeless program to ask about financial legal assistance as he was a 90% service-connected veteran with a wife and special needs child living on a tight budget with accumulating bills.  Tr. at 1559.  He wanted legal help with his finances and indicated that his wife was his fiduciary.  *Id*.  He mentioned that he was off of his medications so that he could participate in a PTSD program.  *Id*.  He was told to call his mental health provider and he was given the intake number for a legal aid office.  *Id*.  Plaintiff presented as indecisive and stressed.  *Id*.  He also called

for help dealing with stress and PTSD issues that he reported had increased. *Id*. at 1556. He wanted to start seeing a mental health treatment counselor again. *Id.* A consult was scheduled. *Id.*

August 10, 2015 progress notes indicate that Plaintiff was referred for a TBI eye examination due to his complaints of blurry vision at a distance with difficulty in bright sunlight and with oncoming headlights. Tr. at 1551. It was noted that he had a full examination on June 20, 2015 that was unremarkable. *Id.* It was determined that Plaintiff was eligible for tinted or transitions photochromic lenses due to TBI. *Id.* at 1552-1553.

September 2, 2015 notes from Dr. O'Rourke, Ph.D, at the Fort Wayne VA Medical Center indicated that Plaintiff called him during his scheduled in-person appointment time and requested a phone appointment instead. Tr. at 1534. Dr. O'Rourke noted that Plaintiff's wife requested guidance on how to obtain neuropsychological testing for Plaintiff as he was still having memory and cognitive issues. *Id.* Dr. O'Rourke indicated that such a consultation was scheduled in 2014, but Plaintiff told him that he canceled it because he was not stable with his medications and needed to rule out sleep apnea first. *Id*. Plaintiff informed Dr. O'Rourke that he had been off of all of his psychiatric medications for several months. *Id.* Dr. O'Rourke contacted neuro-psychologist Dr. Thompson, Ph.D., who indicated that a pre-referral workup was necessary before she could evaluate Plaintiff, and the workup had to include a rule out of sleep apnea or controlled sleep apnea, and values for B-12, Folate, Vitamin D and TSH. *Id.* at 1535.

On October 8, 2015, an agency reviewing psychologist affirmed the opinion of the initial agency reviewing psychologist that the prior ALJ's mental RFC for Plaintiff should be adopted. Tr. at 134.

A CT scan dated November 9, 2015 indicated that Plaintiff had 3 small lung field nodules which could possibly be granulomas. Tr. at 1513.

December 14, 2015 progress notes from Plaintiff's primary care physician indicate that he presented complaining of more frequent headaches. Tr. at 1525. Plaintiff informed his doctor that he had stopped all of his antipsychotic medications and antidepressants and he thought that his mood had improved after stopping all of them. *Id*. Plaintiff also complained of right hip pain with numbness down the right leg. *Id.* He also requested an appointment with podiatry in order to obtain

new shoes and it was noted that he had an appointment a year prior but was not able to make the appointment.  *Id.*  It was also noted that Plaintiff had a sleep study scheduled but he declined to complete it because he said that the instructions were too complex.  *Id.* at 1527.  He requested a residential study.  *Id.*  He was diagnosed with history of migraines, hypertension at goal, obesity with weight loss, ankle instability/pes planus with failure to follow up in June but with another referral, anxiety and mood disorder with PTSD, TBI with a neuro-psychological review referral, tobacco addiction, obstructive sleep apnea with incomplete evaluation, improved metabolic syndrome, hypertriglyceridemia, lumbosacral sprain with sciatica, rule out peripheral neuropathy, and GERD.  *Id.* at 1528.  His medications were continued, and he was referred for x-rays and a MRI.  *Id.*

Plaintiff had a December 29, 2015 appointment for counseling but did not show.  Tr. at 1523.  The counselor called the home and Plaintiff's wife indicated that Plaintiff was at a funeral.  *Id.*

On January 11, 2016, the Fort Wayne VA Medical Center sent a letter to Plaintiff indicating that it had been unable to contact Plaintiff by phone to schedule his appointment.  Tr. at 1522.

Plaintiff was taken to the emergency room on January 14, 2016 by the local sheriff who found him walking in the cold.  Tr. at 2094.  Plaintiff reported that he was under a lot of stress as his father had unexpectedly passed away two weeks prior and he had an argument with his wife.  *Id.*  Upon examination, he was diagnosed with mood disorder and anxiety disorder, given Ativan, and instructed to follow up with his VA psychologist.  *Id.* at 2100-2107.

### B.    TESTIMONIAL EVIDENCE

At the hearing before the ALJ, Plaintiff testified that he was 40 years old, lived with his wife and two of his six children in a two-story house but he resided on the main floor.  Tr. at 39-41.  He indicated that he last worked in 2011.  *Id.*  He testified that he has a driver's license but it was medically recommended that he drive no more than one hour per day.  *Id.* at 40.  Plaintiff explained that "they're finding out that I have traumatic brain injury."  *Id.* at 41.  He represented that the government finally acknowledged the TBI at a zero percent rating and the TBI causes vision and thinking issues.  *Id.*

The ALJ pointed out that the formal testing for the TBI had not yet been performed because Plaintiff did not undergo the sleep study to test for sleep apnea. Tr. at 44. Plaintiff responded that he just received authorization from the VA to get the sleep study and was in the process of contacting someone locally in order to get the testing done. *Id.*

Plaintiff indicated that he was also still having back pain that starts from his neck and moves down through his back. Tr. at 46. He described the pain as constant and he stated that he has to sometimes shift, stand up and stretch, or he has to lie down. *Id.* Plaintiff stated that the pain radiated from his back into his legs and arms and he had pain and numbness in his legs all the way down to his toes and from his back down his arms with numbness into his hands. *Id.* at 47-48. When asked if he had scheduled the EMG that was recommended on his lower extremities, Plaintiff replied that he had not as his short-term memory was "awful." *Id.* at 48. He indicated that he was prescribed a cane but did not use it much as he does not walk enough anymore in order to use it. *Id.*

The ALJ asked Plaintiff how long he could stand, walk, and sit at a time and Plaintiff responded that he could perform each activity for twenty minutes. Tr. at 49-50. Plaintiff testified that he lifts no more than 10 pounds and spends most of his time during the day doing his best to help around the house. *Id.* at 51. He vacuums, washes dishes and tries to do laundry. *Id.* at 46. He also watches his children. *Id.* at 52. He tried to go to college from 2009 to 2011 and was going to register for online classes in 2014, but he had memory issues and did not want to register again because he already dropped out twice due to focus and memory difficulties. *Id.* at 51-52. He watches television, but not for long as it is too intense for his hearing and hurts his eyes. *Id.* at 52. He tries to go on his computer, but does not do so for very long. *Id.* at 53.

When asked about his headaches, Plaintiff testified that he has recently been having them everyday and they were getting worse. Tr. at 53. He also indicated that being around crowds causes him problems. *Id.* at 55.

As to his medications, Plaintiff represented that he was not taking any psychological medications except one for anxiety and only as needed. Tr. at 55. However, Plaintiff testified that two weeks prior to the hearing, he went to the emergency room because he was having a flashback

of his military days. *Id*. at 56.  He called the local sheriff where he lived and the sheriff drove him to the emergency room where they put him on a lower dose of anxiety medication. *Id*.  He no longer takes that medication, but indicated that he spoke to his therapist about getting on a mood disorder medication as he felt that he was not doing well mentally. *Id*. at 58.

The ALJ asked Plaintiff about a record indicating that in 2014, Plaintiff was working at the National History Museum and he stated that he worked three days per week there cleaning and dusting or working the greeter's desk. Tr. at 61.  He indicated that he then started having PTSD symptoms and anxiety and panic attacks, so he had to go home a lot during his workdays. *Id*. He also tried helping family members on a farm but he could not help out because they thought he had too many problems and did not want him to get hurt. *Id*. at 62.

Upon questioning from his attorney, Plaintiff testified that when he stands for twenty minutes, he leans on something, such as a counter or chair. Tr. at 63.  He also indicated that since the ALJ hearing started, his neck and back pain had increased and his head was hurting. *Id.* He explained that when he sits at home, it is usually on the couch where he can elevate his legs or lay down flat to take pressure off of his back and neck. *Id*. at 64.  Plaintiff further testified that he has trouble with his vision because he cannot see well at night, he has trouble with brightness, and with the transition between the evening and nighttime. *Id.* He estimated that he can stand for about 20 minutes, but then has to bend, stretch and lift his legs up and down for at least 20 minutes thereafter. *Id.* at 64-65.  After sitting for 20 minutes, he also has to ease into standing up and starting another activity, which takes 30-40 minutes to do. *Id.* at 65.  He also has to take naps during the day because he has trouble sleeping at night and sometimes has to force himself to sleep during the day because of the pain from headaches. *Id*. at 66.

Plaintiff also reported that he goes to group therapy for combat veterans with PTSD twice per month and he goes to individual therapy twice a month as well. Tr. at 66.  He indicated that the last time that he saw a psychiatrist was a year ago. *Id*. at 67.

Plaintiff also described his ankle, knee and back pain upon standing and sitting after 20-minute periods. Tr. at 67.  He also testified that he has ringing in his ears on and off, and suffers from this sometimes up to three times per week. *Id*. at 68.

-12-

The VE then testified. Tr. at 69.  The ALJ asked the VE to assume a hypothetical individual with Plaintiff's age, education and work background that can perform a reduced range of light work, who can:  carry, push and pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours of an 8-hour workday; stand and walk in combination for 6 hours of an 8-hour workday; have a sit/stand option up to every 30 minutes if needed, but the postural change would not render the person off task; no climbing ladders, ropes or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching and crawling; no forceful grasping or gripping with the hands; avoidance of concentrated exposure to wetness and hazards such as wet, slippery surfaces, dangerous machinery and unprotected heights; no concentrated exposure to bright, flashing lights or loud noises; no ability to understand, remember or execute complex or detailed job instructions; he can perform simple, repetitive tasks on a sustained basis; no sudden or unpredictable workplace changes; no tasks requiring intense or focused attention for prolonged periods of time; working at a flexible pace where the employee is allowed some independence in determining the timing of different work activities or the pace of work; only casual superficial interactions with others, such as supervisors, co-workers, and the public; and no exposure to intense or critical supervision. Tr. at 71-73.  The VE testified that such a hypothetical individual could not perform Plaintiff's past relevant work, but could perform the jobs identified by the ALJ in the previous decision, which were electronics worker, electrical accessories assembler and a folder.  *Id.* at 74.

The ALJ asked the VE to modify the first hypothetical person and impose an ability to alternate between sitting and standing every 15 minutes for up to 5 minutes. Tr. at 72-73.  The VE responded that this modification would not change the jobs or the numbers.  *Id.* at 74.  The ALJ again modified the first hypothetical person and imposed a limitation that the individual could not lift, carry, push or pull more than 10 pounds occasionally and less than 10 pounds frequently.  *Id.* The VE responded that such a hypothetical person could perform the sedentary jobs of a sorter, an assembler, or a final assembler.  *Id.*   The ALJ modified the prior hypothetical person and added a need to alternate between sitting and standing every 15 minutes for up to five minutes, and the VE responded that the same sedentary jobs could be performed.  *Id.* at 75-76.

-13-

Finally, the ALJ presented a fifth hypothetical person with the same limitations, but also with an inability to be on task for 25% of the workday and workweek on a regular and continuing basis. Tr. at 76. The VE responded that if an individual could not maintain at least an 80% production rate, they could not perform full-time competitive work. *Id.* at 76-77.

Plaintiff's counsel asked the VE whether a hypothetical person could maintain any of the jobs identified if the person had to be redirected to task at least once per hour. Tr. at 77. The VE responded that none of the jobs would be available. *Id.* at 78. Plaintiff's counsel asked whether a hypothetical person with the sit/stand option had a 5-minute off task interval between postural changes could maintain competitive employment and the VE said that such a person could not. *Id.* Plaintiff's counsel asked if SVP 2 employment was consistent with a hypothetical person who took no more than the total time of a typical break schedule, but who had to have a break schedule at his will or on his schedule. *Id.* The VE responded that it would not be consistent. *Id.*

## III.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.   An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.   If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.   If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

-14-

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.   ALJ'S DECISION

In her April 27, 2016 decision, the ALJ noted that Plaintiff has previously applied for DIB and SSI on October 4, 2012 which a prior ALJ decided on June 24, 2013.  Tr. at 13.  The ALJ noted the prior ALJ's findings of severe impairments of: history of cervical spondylosis/cervical DDD; chronic back pain due to degenerative arthritis with radiculopathy; history of right ankle fracture, currently stable; reported knee and ankle pain; migraine headaches; tinnitus; episodic mood disorder/depression; PTSD; anxiety; history of alcohol dependence with episodic abuse pattern; and cannabis abuse currently in remission.  *Id.*  The ALJ also indicated the prior ALJ's RFC for Plaintiff as the ability to perform light work with the following limitations: a sit/stand option up to every 30 minutes if needed, but the positional change will not render the individual off task; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching and crawling; never climbing ladders, ropes or scaffolds; no forceful grasping or gripping with the hands; the avoidance of concentrated exposure to wetness and hazards, such as wet/slippery surfaces, dangerous moving machinery, and unprotected heights; no concentrated exposure to bright/flashing lights and loud noises; no ability to understand, remember or execute detailed or complex job instructions; the ability to perform simple, repetitive tasks on a sustained basis; no sudden or unpredictable workplace changes; no tasks requiring intense/focused attention for prolonged periods of time; the ability to work at a flexible pace (where the employee is allowed some independence in determining either the timing of different work activities, or the pace of work); only casual/superficial interactions with others, including supervisors, co-workers and the general public, and no exposure to intense or critical supervision.  *Id.* at 13-14.

The ALJ thereafter cited to *Drummond v. Social Security*, 126 F.3d 837 (6th Cir. 1997) and Acquiescence Ruling 98-4(6) and noted that unless there was new and material evidence or a change in circumstances relating to the determination of the claim before her, she was bound by the determinations of the prior ALJ, including any findings of fact relevant to Plaintiff's RFC.  Tr. at

14.    The ALJ found that Plaintiff had the severe impairments of a history of cervical spondylosis/cervical DDD; chronic back pain due to degenerative arthritis with radiculopathy; history of right ankle fracture, currently stable; reported knee and ankle pain; migraine headaches; tinnitus; episodic mood disorder/depression; PTSD; anxiety; history of alcohol dependence with episodic abuse pattern; and cannabis abuse currently in remission; obesity; mild thoracic degenerative changes; and severe opioid use disorder, currently in remission.  *Id*. at 16.  The ALJ noted that Plaintiff's previous impairments continued to be severe.  *Id.*  She also found that diagnostic testing since the previous decision showed mild thoracic degenerative changes and Plaintiff had been diagnosed with severe opioid use disorder that is in remission.  *Id.*  The ALJ also found that obesity was a severe impairment to consider as well.  *Id.* at 17.  She further explained that while Plaintiff also alleged a TBI, it was not a medically determinable impairment because symptoms alone could not establish a medically determinable impairment and neurologist appointments that Plaintiff had on November 12, 2013 and April 6, 2014 did not indicate a TBI diagnosis and no other diagnostic tests in the record substantiated this allegation.  Tr. at 17.

The ALJ proceeded on to determine that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  Tr. at 17.  She specifically reviewed Listing 1.02 for major dysfunction of a joint, Listing 1.04 for disorders of the spine, Listing 11.03 for epilepsy-nonconvulsive epilepsy, Listing 12.04 for affective disorders, Listing 12.07 for somatoform disorders, Listing 12.08 for personality disorders, and Listing 12.09 for substance addiction disorders.  *Id.*

As to Plaintiff's RFC, the  ALJ explained that she was bound by the prior ALJ's findings and determinations under AR 98-3(6) and 98-4(6) because although there was new evidence in the record, the new evidence did not show substantial change in Plaintiff's conditions.  Tr. at 19.  She indicated that the prior ALJ's RFC analysis remained consistent with the objective medical evidence of record.  *Id.* at 19-20.  She therefore found that Plaintiff could perform light work with the abilities to:  lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours per day; walk/stand in combination for 6 hours a day; a sit/stand option that allows for alternating

between sitting and standing up to every 30 minutes, if needed, but the positional change will not render the claimant off task; no climbing ladders, ropes or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching and crawling; no forceful grasping or gripping with the hands; the avoidance of concentrated exposure to wetness and hazards, such as wet/slippery surfaces, dangerous moving machinery, and unprotected heights; no concentrated exposure to bright/flashing lights and loud noises; no ability to understand, remember or execute detailed or complex job instructions; the ability to perform simple, repetitive tasks on a sustained basis; no sudden or unpredictable workplace changes; no tasks requiring intense/focused attention for prolonged periods of time; the ability to work at a flexible pace (where the employee is allowed some independence in determining either the timing of different work activities, or the pace of work); only casual/superficial interactions with others, including supervisors, co-workers and the general public, and no exposure to intense or critical supervision. *Id*. at 13-14.

The ALJ also reviewed Plaintiff's hearing testimony, the medical evidence, and Plaintiff's VA service-connected disability ratings. Tr. at 20-25. She concluded that with the RFC of the prior ALJ and the testimony of the VE, Plaintiff could perform the requirements of representative occupations of electronics worker, electrical accessories assembler, and folder. *Id.* at 26. The current ALJ therefore found that Plaintiff was not under a disability from June 25, 2013 through December 31, 2015, Plaintiff's date last insured. *Id.*

**V.**     **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).  When substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001). Thus, the ALJ has a " 'zone of choice' within which she can act without the fear of court interference. *Id.* at 773.

## VI.    ANALYSIS

### A.    VA DECISION

Plaintiff first challenges the ALJ's finding concerning Plaintiff's VA 90% service-connected 90% disability rating. ECF Dkt. #16 at 10-12.  The undersigned recommends that the Court find that the ALJ adequately applied the law and substantial evidence supports her analysis of the VA determination on Plaintiff's request for social security benefits.

The social security regulations provide that "[a] decision by ... any other governmental agency about whether you are disabled is based on its rule and not our decision about whether you are disabled or blind." 20 C.F.R. §§ 404.1504, 416.904.  The regulations further provide that such decisions are not binding upon the SSA. *Id.*  Social Security Ruling 06-03p ("SSR 06-03p"), which has been rescinded effective for claims filed on or after March 27, 2017, acknowledged these regulations, but clarified that although other agency decisions may not be binding:

> we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)). Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.
>
> These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules. We will evaluate the opinion evidence from medical sources, as well as "non-medical sources" who have had contact with the individual in their professional capacity, used by other agencies, that are in our case record, in accordance with 20 CFR 404.1527, 416.927, Social

> Security Rulings 96-2p and 96-5p, and the applicable factors listed above in the section "Factors for Weighing Opinion Evidence."
>
> Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.

Plaintiff contends that the ALJ used boilerplate language in considering the VA rating and failed to consider that the largest percentages of Plaintiff's disability through the VA were based upon Plaintiff's migraines and his PTSD. ECF Dkt. #16 at 10. Plaintiff further asserts that "the rationale that the ALJ opinion attempts to use to not weight the VA rating is misapplied, but to the extent it holds water as a valid line of analysis, should have been applied to examine how to treat the 0% disability Traumatic Brain Injury rating." *Id.* at 11. Plaintiff complains that the ALJ improperly weighed the 0% TBI rating against him, "without acknowledging the evidentiary oomph of the 90% determination in its many layers, or as to any of the layers." *Id.*

The Sixth Circuit Court of Appeals has not set forth a specific standard concerning the weight that the Commissioner should attribute to a VA disability determination. *Ritchie v. Comm'r of Soc. Sec.,* 540 Fed. App'x 508, 510, citing *Stewart v. Heckler*, 730 F.2d 1065 (6th Cir. 1984). However, the Court indicated that "the Commissioner may nonetheless find an agency's determination relevant, depending on the similarities between the rules and standards each agency applies to assess disability." *LaRiccia v. Comm'r of Soc. Sec.* 549 Fed.App'x 377, 387 (6th Cir. Dec. 13, 2013), unpublished, citing SSR 06–03p, 2006 WL 2329939, at *7 (August 9, 2006). Although the Sixth Circuit found in *LaRiccia* that the ALJ's reasons for affording no weight to a 100% VA disability rating were erroneous, it made clear that SSR 06-03p requires that the ALJ explain the consideration given a VA disability determination. *Id.* at 388.

Here, the ALJ specifically acknowledged the service-connected disability ratings from the VA. Tr. at 24. She noted each percentage of service-related disability, including 10% for inflammation of the sciatic nerve, 20% for inflammation of the lower radicular nerves, 30% for migraines, and 30% for PTSD. *Id.* She further acknowledged that Plaintiff testified to a 0% rating

from the VA for TBI.  *Id*. at 20.  She noted that pursuant to 20 C.F.R. §§ 404.1527 and 416.927, the VA disability ratings and findings are not medical opinions under the Social Security Regulations and had limited evidentiary value without the supporting evidence upon which the ratings were based.  *Id*. at 24-25.  She explained that the percentage values of the VA ratings varied with the severity of the veteran's medical condition applied to a hypothetical average person's ability to earn income.  *Id*. at 25.  She contrasted this with the fact that the SSA does not assess degrees of severity but rather determines whether a claimant is disabled or blind and a claimant must meet the social security definition of disability by having a severe impairment that makes him or her unable to perform past relevant work or any other substantial gainful work that exists in the national economy. *Id*.  The ALJ then attributed some weight to the VA rating determinations, reasoning that the ratings showed that Plaintiff had limitations in his ability to perform work-related tasks as she determined in his RFC.  *Id*.  She therefore clearly considered the VA ratings and even attributed them some weight in determining Plaintiff's RFC.  The undersigned accordingly recommends that the Court find that the ALJ applied the proper standard in considering the VA disability ratings and substantial evidence supports her determination.  *See Ritchie*, 540 Fed.App'x at 510 (ALJ did not err in weight that she gave to VA disability rating of 100% as she indicated that she considered the disability determination but was not bound by it under social security law).

### B.    CONSIDERING IMPAIRMENTS IN COMBINATION AND RFC

Plaintiff's second assertion of error is difficult to narrow down, as it begins by arguing that the ALJ erred by failing to give credence to testimony concerning the combination of his impairments because she improperly overemphasized the need for the most accurate diagnostic tests, yet she failed to further develop the record as to his impairments.  ECF Dkt. #16 at 12-13.  However, rather than pointing to specific errors made by the ALJ at Step Three, Plaintiff proceeds to challenge the physical RFC that the ALJ determined, such as his abilities to be on task during position changes, sitting, standing or walking up to 6 hours of an 8-hour workday, and the lack of more restrictive fingering or handling limitations and foot pedal limitations.  *Id.*  Plaintiff also challenges the ALJ's lack of mental limitations concerning his TBI.  *Id.*  Most of the argument in this second assertion of error consists of citing to social security law and cases for general concepts such as

developing the record and applying *Drummond*. *Id*. at 12-14.  The only applicable facts discussed are those relating to the ALJ's RFC and Plaintiff's testimony as to restrictions more limited than those in the RFC. *Id.* Plaintiff does not offer the restrictions that should have been imposed. Nor does he point to the evidence that would support additional restrictions, beyond his own testimony.

Insofar as Plaintiff presents a challenge to the ALJ's Step Three analysis, the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity. 20 C.F.R. §§ 404.1520, 416.920. In the third step of the analysis to determine a claimant's entitlement to social security benefits, it is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987).

In order to meet a listed impairment, the claimant must show that his impairments meet all of the requirements for a listed impairment. *Hale v. Sec'y*, 816 F.2d 1078, 1083 (6th Cir. 1987). An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  An impairment or combination of impairments is considered medically equivalent to a listed impairment "* * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments." *Land v. Sec'y of Health and Human Servs.*, 814 F.2d 241, 245 (6th Cir.1986) (per curiam). Generally, an ALJ should have a medical expert testify and give his opinion before determining medical equivalence. 20 C.F.R. § 416.926(b). In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531.

An ALJ does not have a "heightened articulation standard" in considering the listing of impairments. *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir.2006). Rather, the Court considers whether substantial evidence supports the ALJ's findings. *Id.* However, an ALJ's decision must contain "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Reynolds v. Comm'r of Soc. Sec.*, No. 09-2060, 424 Fed. App'x 411, 415–416 (6th Cir.

April 1, 2011), unpublished. The Court may look to the ALJ's decision in its entirety in order to justify the ALJ's Step Three analysis. *Bledsoe*, 165 Fed. App'x at 411.

The undersigned recommends that the Court find that the ALJ applied the proper standards and substantial evidence supports the ALJ's Step Three analysis and determination.  In this case, while Plaintiff asserts that the ALJ failed to consider Plaintiff's impairments in combination, he fails to specifically identify the Listings that he believes his combination of impairments meet or equal and the evidence that supports his assertion.  Further, the ALJ fully analyzed Plaintiff's impairments at Step Three and expressly stated as much in her Step Three analysis. Tr. at 16-17.  She expressly stated in her decision that she considered Plaintiff's impairments individually and in combination, which is sufficient to show that she considered the impairments in combination. *See Gooch*, 833 F.2d at 591-592 (fact that ALJ referred to "a combination of impairment**s**" in plural form was sufficient to show that ALJ considered impairments in combination).  An ALJ is not required to discuss every piece of evidence in the record. *Kornecky*, 167 Fed. App'x at 508.  The ALJ also specifically indicated that Plaintiff's impairments or combination of impairments did not meet or equal any of the Listings. *Id*. She cited Listing 1.02 for major dysfunction for a joint, 1.04 disorders of the spine, and Listing 11.03 for epilepsy-nonconvulsive epilepsy. *Id*. at 17.  She also specifically considered Listing 12.04 for affective disorders, Listing 12.07 for somatoform  disorders, Listing 12.08 for personality disorders, and Listing 12.09 for substance addiction disorders. *Id.*  The ALJ provided a lengthy discussion of the medical evidence concerning Plaintiff's impairments.

As to Plaintiff's challenges to the ALJ's RFC determination, the undersigned also recommends that the Court find that substantial evidence supports the ALJ's findings.  It is the ALJ who is responsible for determining a claimant's RFC.  20 C.F.R. § 404.1546(c); *Fleisher v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011).  The RFC is the most that a claimant can still do despite his restrictions.  SSR 96-8p.  It is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id*.  It is a claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the

RFC assessment must include a discussion of the individual's abilities on that basis." *Id*. The Ruling defines a "regular and continuing basis" as 8 hours per day, five days per week, or the equivalent thereof. *Id*.

In determining a claimant's RFC, SSR 96-8p instructs that the ALJ must consider all of the following: (1) medical history; (2) medical signs and lab findings; (3) the effects of treatment, such as side effects of medication, frequency of treatment and disruption to a routine; (4) daily activity reports; (5) lay evidence; (6) recorded observations; (7) statements from medical sources; (8) effects caused by symptoms, such as pain, from a medically determinable impairment; (9) prior attempts at work; (10) the need for a structured living environment; and (11) work evaluations. SSR 96-8p. The ALJ must provide "a narrative discussion "describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." *Id*. The ALJ must also thoroughly discuss objective medical and other evidence of symptoms such as pain and set forth a "logical explanation" of the effects of the symptoms on the claimant's ability to work. *Id*. However, "[a]n ALJ need not discuss every piece of evidence in the record in order for his decision to stand." *Thacker v. Comm'r of Soc. Sec*., 99 Fed. App'x 661,665 (6ᵗʰ Cir. 2004), unpublished.

Plaintiff complains about the ALJ's findings regarding his sitting, standing and walking abilities, the lack of fingering and foot pedal restrictions, and the finding that he could be on task during position changes. ECF Dkt. #16 at 9-10. He cites to his own testimony as support for his assertions. He also asserts that the ALJ's mental RFC for him is improper because she "played doctor" by weighing against him the fact that the VA failed to provide proper specialists or testing to determine the TBI. *Id*. at 10.

The ALJ in this case partly relied upon Plaintiff's testimony in determining his RFC. Tr. at 20. She cited to Plaintiff's testimony that he could only sit, stand or walk for 20 minutes at a time, he could lift no more than 10 pounds, his problems with memory and concentration, and his problems with migraines, tinnitus, and vertigo. *Id*. The ALJ reviewed the prior ALJ's RFC and the evidence currently before her, and found no worsening in Plaintiff's prior impairments. *Id*. She therefore applied the prior ALJ's RFC. *Id.*

-23-

The ALJ also discussed Plaintiff's physical impairments, including ankle instability, knee pain, DDD of the back and neck, and migraines.  Tr. at 20-24.  She indicated that she reviewed the VA records and found no significant worsening in these conditions.  *Id.* at 21.  She noted Plaintiff's move to Ohio to be close to the family of his wife, where he helped on the family farm and in remodeling a farmhouse.  *Id.* at 22-23.  She cited to Plaintiff's testimony that he was keeping busy working on the farm.  *Id.* The ALJ acknowledged that Plaintiff testified that he was only able to perform this work for a limited time period.  *Id.*  She also cited to the VA's denial of Plaintiff's request for homebound services as the VA found that Plaintiff did not need assistance due to physical limitations.  *Id.* at 23.  She also referred to the cervical x-ray showing mild disc space narrowing at C6-C7 and an EMG showing moderate to severe right median neuropathy but no cervical nerve root irritation.  *Id.*  She further relied upon the findings of the state agency medical consultants who recommended that the ALJ adopt the RFC of the prior ALJ.  *Id.* at 123, 136.  The ALJ gave partial weight to the agency examining physician who found that Plaintiff was able to sit, stand, and walk  eight hours of the workday, he had no manipulative or environmental limitations, and he required no lifting or postural limitations.  *Id.* at 24.  The ALJ found Plaintiff more limited than the agency examining physician based upon the objective medical evidence, but she found no worsening or significant improvement in Plaintiff's impairments since the prior ALJ's decision.  *Id.* Finally, the ALJ also relied in part on the VA disability ratings concerning Plaintiff's physical impairments, finding that the standard for disability for the VA is different than that of social security, but nevertheless considering the limitations resulting from the VA ratings.  *Id.*

Thus, in determining Plaintiff's physical RFC, the ALJ relied upon the medical evidence, the prior ALJ's RFC, the agency physicians who reviewed Plaintiff's medical records and examined him, and Plaintiff's testimony.  Upon her review, the ALJ determined Plaintiff's physical RFC to be reduced light work with additional restrictions of a sit/stand option that allows for alternating between sitting and standing up every thirty minutes, never climbing ladders, ropes or scaffolds, occasionally climbing ramps and stairs, occasionally balancing, stooping, kneeling, crouching and crawling, and no forceful grasping or gripping with the hands.  Tr. at 19. Upon review of the ALJ's

decision, the undersigned recommends that the Court find that the ALJ applied the proper legal standard and substantial evidence supports her physical RFC for Plaintiff.

Plaintiff also asserts that the ALJ should have done more in order to determine Plaintiff's mental RFC, rather than merely "playing doctor" and finding by default that Plaintiff's psychological impairments were not as severe because the VA did not provide proper specialists or sufficient testing for his TBI.  ECF Dkt. #16 at 10-11.  Plaintiff asserts that the ALJ should have more fully developed the record as to his TBI and related restrictions.  *Id.*  However, Plaintiff does not identify the additional restrictions that the ALJ should have found or the errors allegedly made by the ALJ in determining his mental RFC.

The ALJ does not have a duty to seek out a claimant's physicians for opinions or examinations.  20 C.F.R. §§ 404.1512 and 416.912 explicitly state:

> In general, you have to prove to us that you are blind or disabled.  This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s).  If material to the determination whether you are disabled, medical and other evidence must be furnished about the effects of your impairment(s) on your ability to work.[3]

In addition, Plaintiff was represented by counsel at the hearing, and thus the ALJ had no special, heightened duty to develop the record.  *See Trandafir v. Comm'r of Soc. Sec.*, 58 Fed.App'x. 113, 115 (6th Cir. 2013).  Accordingly, the undersigned recommends that the Court find that Plaintiff has failed to show that the ALJ erred by not seeking out additional opinions and consultations from Plaintiff's physicians.

Moreover, the ALJ addressed Plaintiff's TBI by concluding that it was not a medically determinable impairment because no diagnosis of TBI was made at Plaintiff's neurologist visits on November 15, 2013 or April 16, 2014, no diagnostic tests in the record confirmed such a diagnosis, and Plaintiff had failed to meet the burden to establishing the existence of a TBI by more than mere symptoms alone.  Tr. at 17.  The ALJ did note a diagnosis of history of TBI and PTSD and she noted that Plaintiff became noncompliant with his psychiatric medications and was hospitalized as a result.  *Id*. at 23.  The ALJ also cited to records indicating that Plaintiff eventually stopped taking all of his

---

[3]20 C.F.R. § 416.912 addresses potential claimants as "you."

psychiatric medications and she noted Plaintiff's testimony at the hearing and to his doctor that he felt better off of the psychiatric medications then when he was on them. *Id.* The ALJ indicated that Plaintiff did not schedule follow-up appointments for medication management. *Id.* Despite these facts, the ALJ nevertheless continued the prior ALJ's mental limitations for Plaintiff because while he was off of all psychiatric medications, he continued to go to counseling for support. She therefore limited Plaintiff's mental RFC to jobs that have simple, repetitive tasks on a sustained basis, but that do not require understanding, remembering or carrying out detailed or complex instructions, no sudden or unpredictable workplace changes, no intense or focused attention for prolonged periods of time, a flexible pace, only casual/superficial interactions with others, including supervisors, co-workers, and the general public, and no exposure to intense or critical supervision. *Id.* at 19. Based upon the evidence before the ALJ and Plaintiff's testimony, the undersigned recommends that the Court find that the ALJ applied the correct legal standards and substantial evidence supports her mental RFC for Plaintiff.

### C. CREDIBILITY

Plaintiff also asserts that the ALJ erred by failing to grant him credibility for his military service. ECF Dkt. #16 at 14-15. Plaintiff implies that the ALJ should hold his testimony in "higher regard" due to his military service, which shows his long and continuous work record and his demonstrated hard work in therapy for years. *Id.* at 14.

The social security regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529, SSR 96–7p, (superseded by SSR 16-3p, effective March 28, 2016). In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir.1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038–1039 (6th Cir.1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the

-26-

individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96–7p. *See* SSR 96–7p, These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039–40.

Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at 1234. The Court is limited to "evaluating whether or not the ALJ's explanations for partially discrediting" a claimant "are reasonable and supported by substantial evidence in the record. *Sorrell v. Comm'r of Soc. Sec*., 656 Fed. App'x 162, 173, quoting *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 475-476 (6th Cir.1997)(citing *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 531 (6th Cir. 1997)(citing *Kirk*, 667 F.2d at 538)). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir.2005).

Here, Plaintiff cites to no authority requiring an ALJ to give greater credibility to the testimony of a military veteran or to a claimant with a long work history. *See Barney v. Comm'r of Soc. Sec.*, No. 1:08-cv-1225, 2010 WL 1207877, at *4 (W.D. Mich., Jan 20, 2010), unpublished. In fact, in *Barney*, the court noted that "[t]he Sixth Circuit has never held that a social security benefits claimant is entitled to a 'presumption of credibility.'" *Id.*  The court further held that "[i]t

is the ALJ's function to determine credibility issues, *see Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir.1987), and the claimant's work history is only one of the many factors that the ALJ can consider in making his credibility determination. *[s]ee* 20 C.F.R. § 404.1529; *see also White v. Commissioner*, 572 F.3d 272, 287 (6th Cir.2009))." *Barney*, 2010 WL 1207877, at *4.

Thus, while Plaintiff's military service in the instant case is commendable, there is no requirement that the ALJ attribute greater weight to his credibility.  Plaintiff's long work history is but one factor among many that the ALJ can consider in making her credibility determination.  The ALJ in the instant case reviewed the medical evidence, Plaintiff's treatment history, the opinions of the state agency psychologists, Plaintiff's statement that he felt better when he was not on psychiatric medications, and Plaintiff's daily living activities in specific detail.  Tr. at 17-24.  She indicated that Plaintiff drives a car up to three hours at a time, uses public transportation, attends group therapy with 17 or 18 other participants, and helped out at a family member's farm.  The undersigned recommends that the Court find that the ALJ's credibility determination is reasonable and supported by substantial evidence in the record.

## VII.   RECOMMENDATION AND CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision, and DISMISS Plaintiff's case with prejudice.


DATE: June 12, 2017                          ___*/s/George J. Limbert*_____
                                             GEORGE J. LIMBERT
                                             UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).